**UNITED STATES of America, Plaintiff/Appellant,**

v.

**Robert THOMAS, Defendant/Appellee.**

No. 86–1353.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 12, 1987.

Decided April 14, 1988.

As Amended on Denial of Rehearing Dec. 22, 1988.

Sanford Svetcov, Asst. U.S. Atty., San Francisco, Cal., for plaintiff/appellant.

R. Bruce Finch and Richard Humphrey, Hayward, Cal., for defendant/appellee.

Before FLETCHER and REINHARDT, Circuit Judges, and KENYON,* District Judge.

KENYON, District Judge:

Robert Thomas was charged by indictment with two counts of illegal possession of firearms in violation of 18 U.S.C.A. (App.) § 1202(a). Defendant filed a motion to suppress seeking the suppression of all evidence seized without warrant. The government response included a declaration of the investigating and arresting officer, Allen Siegel. The district court held an evidentiary hearing in which Officer Sie-

---

* Hon. David V. Kenyon, United States District Judge for the Central District of California, sitting by designation.

gel testified. The motion to suppress was granted at the conclusion of the hearing, and the district court articulated its reasons for granting the motion on the record. The district court later issued its written order granting the motion to suppress on June 19, 1986. The government filed a motion for reconsideration of the order; the district court denied this motion by written order on October 23, 1986. The government appeals both orders. We affirm the district court, but on different grounds. We uphold the initial stop as being based on founded suspicion,[1] but find that the subsequent detention and frisk were not justified by the facts of the case.

## I. Factual Background

At 3:59 p.m. on February 6, 1986 a San Francisco storeowner made a phone report to the police that two men were offering counterfeit money to passers-by at 16th and Valencia Streets. The storeowner described the two as follows:

Black men in their late 30's, early 40's, 5'9", 5'10", one wearing a dark blue, navy wool cap, glasses, and a light tan coat, the other wore a brown plaid suit.

About three minutes later, the police dispatcher issued a broadcast that two men were supposedly offering counterfeit money to people near 3040 16th Street and gave the following description of the two men:

[T]wo Negro males, 35–40 years, one 5'10" wearing a dark, blue cap, glasses, and a tan coat, the other wearing a plaid suit.

Officer Siegel of the San Francisco Police Department was approximately a block away from the scene of the alleged passing of counterfeit money when he heard the police broadcast. Officer Siegel was alone in a traffic patrol car at the time. Moments after hearing the broadcast, Officer Siegel saw a car attempting to exit out of an entrance to a bank parking lot at 16th and Hoff Streets, located across the street from the scene of the alleged passing of

counterfeit money. Officer Siegel stated that his attention was initially drawn to the car because it was exiting the parking lot the wrong way. Officer Siegel activated his patrol car's emergency red lights and pulled his patrol car in front of the suspects' car to effect the stop.

Before Officer Siegel got out of his car, he made a broadcast that he had spotted the suspects, gave the license plate number of the car, and said that he "was going to exit the car" and that he would be "taking these two people on." Officer Siegel later explained that "taking these two people on" meant that he was going to investigate the alleged counterfeiting scheme. As Officer Siegel walked towards the suspects' car, Thomas, the driver, got out of the car and walked towards the officer. When Officer Siegel asked Thomas what he was doing in the parking lot, Thomas replied that he was waiting for his wife who was in the bank. Officer Siegel told Thomas that he was investigating a counterfeiting scheme and asked Thomas for his driver's license as identification, which Thomas voluntarily gave to the officer. Officer Siegel examined the photograph on the license and determined that it was of Thomas, but did not return the license.

Holding on to Thomas' license, Officer Siegel circled around Thomas in order to position himself so that Thomas and the passenger seated in the car were in his direct line of vision. Officer Siegel then asked Thomas if he had any weapons. When Thomas did not respond, Officer Siegel patted down the exterior of Thomas' clothing and felt what seemed to be a handgun in Thomas' jacket pocket. He took a gun from Thomas' pocket and placed Thomas under arrest for carrying a concealed weapon. After handcuffing Thomas, Officer Siegel called for back-up. When the other officers arrived, they approached the passenger of the car and detained him. He appeared to match the description of a suspect in an armed bank robbery that had occurred earlier that day.

---

1. In this circuit the terms "founded suspicion" and "reasonable suspicion" are used interchangeably to describe the cause that is sufficient to justify an investigatory stop. *United*

*States v. Burnette,* 698 F.2d 1038, 1047 n. 16 (9th Cir.), *cert. denied,* 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 312 (1983).

The passenger was wearing a tan-colored jacket and had long reddish hair. The victim teller was brought to the scene and identified the passenger as the bank robber. When the passenger was removed from the car, one of the officers noticed a second handgun in the front seat of the car and retrieved it.

We must address two issues: 1) Was there founded suspicion to justify the stop of Thomas? 2) If the stop was justified, were the subsequent detention and frisk of Thomas justified?

## II. Standard of Review

■ Motions to suppress are generally reviewed *de novo. United States v. Limatoc,* 807 F.2d 792, 794 (9th Cir.1987) (citing *United States v. Andrade,* 784 F.2d 1431, 1433 (9th Cir.1986)). As we explained in *United States v. McConney,* 728 F.2d 1195, 1202–03 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), mixed questions of law and fact usually require *de novo* review, although the clearly erroneous standard applies if the necessary analysis is predominantly factual in nature. Whether there was founded suspicion to justify an investigatory stop is such a mixed question of law and fact and therefore requires *de novo* review. *United States v. Maybusher,* 735 F.2d 366, 371 & n. 1 (9th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985).[2]

## III. Whether There was Founded Suspicion to Justify the Stop

■ Because it is undisputed in this case that a seizure (or investigatory stop) that required Fourth Amendment protection occurred, the first issue we must address is whether there was a founded suspicion of criminal conduct to justify the stop. The level of cause necessary to provide a sufficient basis for a brief investigatory stop was first outlined in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and further defined in *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez,* 449 U.S. at 417, 101 S.Ct. at 695.[3] In evaluating the lawfulness of the stop, the "totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 417–18, 101 S.Ct. at 694–95. Founded suspicion must exist at the time the officer initiates the stop. *United States v. Fouche,* 776 F.2d 1398, 1402 (9th Cir.1985). The totality of circumstances analysis applies to the stop of a moving vehicle. *Id.*

A fresh review of Officer Siegel's declaration and testimony demonstrates that the

**2.** While we initially expressed some doubt as to the correctness of *Maybusher, see United States v. Magana,* 797 F.2d 777, 779–80 (9th Cir.1986), we subsequently reaffirmed its holding in a number of cases. *See, e.g., United States v. Kerr,* 817 F.2d 1384, 1386 (9th Cir.1987). Thus, *Maybusher* remains the law of the circuit.

Appellee argues that the standard of review of the district court's order denying reconsideration is clear error. The motion for reconsideration simply brought to the district court's attention the police report on the arrest of the passenger. In the report Officer Siegel noted that the passenger in Thomas' car was wearing a "camel colored jacket" when arrested. The district court was urged to consider this factor along with the other factors put forth by the government to justify the stop. In denying reconsideration, the district court explained its earlier ruling on the insufficiency of the reasons articulated by Officer Siegel to support the detention of Thomas and specifically explained why it had discounted Officer Siegel's testimony concerning the tan jacket. The fact that one of the suspects was wearing a tan jacket was evidence that was before the district court and considered by the district court when it issued its order granting the motion to suppress. Therefore, we will consider the review of the order denying reconsideration as part of the district court's determination that Officer Siegel's detention of Thomas was unlawful. *De novo* review applies to both. *United States v. Limatoc,* 807 F.2d at 794 (defendant's motion to suppress granted and government's motion for reconsideration denied; *de novo* standard of review applied to both).

**3.** An investigatory stop also applies to a person wanted for past criminal activity. *United States v. Cortez,* 449 U.S. at 417 n. 2, 101 S.Ct. at 695 n. 2.

stop was justified.[4] By weighing the permissible factors articulated by Officer Siegel for making the stop—the suspects' age, sex, and race,[5] the number of suspects, the glasses worn by one of the suspects, the location of the stop, the closeness in time of the police broadcast and the stop, and the suspects' car exiting the parking lot via the lot's entrance—and the inferences that can be drawn from these factors, we find that there is enough to support a founded suspicion to justify the initial stop.[6]

4. The district court made the following relevant factual findings in its June 18, 1986 order granting the motion to suppress "all evidence seized without a warrant from the person and immediate presence of defendant and from the motor vehicle in which he was riding":

\* \* \* \* \* \*

2. The dispatch [Officer Siegel] received made no mention of the suspects' automobile or that they were using an automobile.

3. The officer was approximately one block away from the location reported in the dispatch. There is substantial foot traffic and vehicle traffic in the area.

4. Shortly after hearing the dispatch Officer Siegel observed a gold Cadillac automobile leaving the wrong way out of a bank parking lot. The officer saw two black males in their thirties in the car. One of them was wearing glasses. He did not see a navy blue cap. Although he now says he 'thinks' one of the suspects was wearing a tan coat, he made no mention of this in his declaration filed in advance of the hearing.

\* \* \* \* \* \*

6. The officer demanded that defendant produce his driver's license whereupon defendant presented Officer Siegel with a valid California driver's license at which point defendant was pat searched and a handgun was removed from his person.

7. Officer Siegel had no information which would connect the two black men with any automobile, indeed from the dispatch it was more likely that the individuals suspected of passing counterfeit money would have been on foot.

8. Although the officer prepared a declaration under penalty of perjury which was filed with this court, concerning his actions knowing that it would be used by the government in an attempt to establish probable cause, he did not mention seeing a tan jacket, until he testified at the hearing that he 'may' have seen one.

9. The Cadillac which was on private property did not violate any traffic laws of the State of California.

10. Officer Siegel, while holding on to defendant's California driver's license, walked behind defendant so that he could survey defendant, the Cadillac which was approximately ten feet away and its still seated passenger. It was at this point that defendant was pat searched because, in the words of the officer 'he always pats down everybody in the same situation' and had decided to 'take these two on when he first saw the two black men in the Cadillac.'

The district court found that the officer knew that the suspects were two black males in their thirties, the relevant age range, but concluded in the order granting the suppression motion that the only articulable reasons for the detention were "two black males, one with glasses, in the environs of the counterfeit scam." Despite this statement, the district court made a specific factual finding that age was considered by Officer Siegel before making the stop and also recognized at the suppression hearing that age was a factor. In its October 23, 1986 order denying reconsideration, the district court also clarified the apparent omission in the order granting the suppression motion: "In his declaration filed in support of the government's opposition to the suppression motion, Officer Siegel says he stopped the suspects because they were black, approximately the right age, and because one wore glasses." Therefore, it appears that the district court did consider the age of the suspects as an articulable fact.

In concluding that there was not founded suspicion for the stop, the district court stated:

The only articulable reasons for the detention are two black males, one with glasses, in the environs of the counterfeit scam. There is no other identification linking these two to the offense. Thus, it appears that any two black males, one of whom was fortuitously wearing glasses, would be detained if they were in the area. It is not disputed that the area is heavily trafficked. The reasons articulated by the officer are not sufficient to support a detention.

5. Race was a permissible factor for Officer Siegel to consider in making the stop. *United States v. Fouche,* 776 F.2d 1398, 1402–03 (9th Cir.1985) (race may be considered as one of the factors contributing to a founded suspicion of criminal conduct, although race alone cannot justify an investigatory stop). Appellant argues that the district court weighed the racial factor too heavily and therefore concluded that the stop was based on little more than the defendants' racial appearance. Because we review the validity of the stop *de novo,* we will not assess whether the district court improperly weighed the racial factor.

6. Officer Siegel did not observe the clothing of the suspects or their height before making the stop, presumably because they were in a car. This alone, however, does not invalidate the stop. *See, United States v. Pinion,* 800 F.2d 976, 979 (9th Cir.1986), *cert. denied,* 480 U.S. 936,

Officer Siegel stated that the car exiting the wrong way from the parking lot initially caught his attention. Under the circumstances, we find that this was a permissible factor for the arresting officer to consider in making the stop. Officer Siegel could have reasonably drawn the inference that although the alleged counterfeiters were reported on foot, they could have easily had access to a car. This inference is supported by the close proximity of the stop to the scene of the alleged passing of counterfeit money and the brief lapse of time between the police broadcast and the stop. It was reasonable for Officer Siegel to infer that the alleged counterfeiters were leaving the area in a car that was parked in a lot across the street by exiting and that in their haste were exiting the wrong way from the parking lot. *See United States v. Fouche,* 776 F.2d at 1403 (inferences or deductions apparent to trained law enforcement officers may be considered under the totality of circumstances).

Officer Siegel stated that the suspects' car was causing congestion in the parking lot but acknowledged that the car was not causing traffic congestion on the street. There is little significance to the fact that Thomas was not violating any traffic laws in attempting to exit out of the entrance to the lot or even that there was no congestion caused in the street by his maneuver. "The test is not whether the conduct under question is consistent with innocent behavior; law enforcement officers do not have to rule out the possibility of innocent behavior." *United States v. Sutton,* 794 F.2d 1415, 1427 (9th Cir.1986). Based on his experience and training as a police officer, Officer Siegel's attention was reasonably drawn to the car, and he made a reasonable inference that the suspects driving the car were possibly those involved in the counterfeiting scheme.

■ Officer Siegel stated in his declaration that after his attention was drawn to the car, he then noticed that the occupants of the car appeared to match the descriptions of the suspects in the police broadcast—the occupants of the car were two black males, the occupants were in the relevant age range, and one was wearing glasses. Officer Siegel stated that "[b]ased upon the appearance of the two men being similar to the radio broadcast, together with the fact of their location in the immediate vicinity of the reported crime just after it had apparently occurred, I decided to investigate further."

The government argues that one of the factors that should be considered as part of the totality of circumstances was the tan jacket worn by the passenger. We apply the clearly erroneous standard for the review of the district court's ruling on the credibility of Officer Siegel on this issue.[7] *United States v. Clawson,* 831 F.2d 909, 914 (1987). The government has failed to meet its burden of showing that the district court's decision not to consider the tan jacket was clearly erroneous. The government argues that we should draw the inference from the context of Officer Siegel's testimony that he saw the tan jacket prior to the stop. However, this is not the logical inference that should be drawn. As the district court found, Officer Siegel never included this information in his declaration, even though he specifically stated in his declaration the factors he considered before making the stop and even though he knew that the declaration would be used by the government to provide support for the stop. In addition, although he was questioned at the hearing about the tan jacket, Officer Siegel mistakenly stated that he

---

107 S.Ct. 1580, 94 L.Ed.2d 770 (1987) (probable cause for arrest found even though defendant's clothes did not match the suspect's).

**7.** In its order denying reconsideration, the district court clarified its finding that the tan jacket was not one of the articulable facts on which the officer based Thomas' detention. The district court explained that "evidence that one of the suspects was wearing a tan jacket at the time of the detention does not prove that that fact was within the knowledge of the arresting officer at the time of the detention and formed a part of his decision to make the detention." Because Officer Siegel equivocated on which suspect was wearing a tan jacket and failed to state that he observed the tan jacket before making the stop, the district court did not include the tan jacket as one of the articulable facts.

thought Thomas was wearing the jacket. Finally, Officer Siegel never stated that he saw the tan jacket before making the stop and that the tan jacket was one of the factors he considered before stopping the suspects. The district court was not clearly erroneous in refusing to consider the tan jacket. Only those articulable factors that are truly relied on by a police officer before making a stop should be considered as part of the determination on the reasonableness of a stop.

Although we uphold the district court on the narrow issue of the tan jacket, we nevertheless conclude that the other permissible factors considered by Officer Siegel were sufficient and that a founded suspicion for the investigatory stop existed.

## IV.  *Whether the Subsequent Detention and Frisk of Thomas Were Justified*

It is clear that Officer Siegel effected a temporary stop for investigatory purposes. Based on the objective and articulable facts given by Officer Siegel for the stop, we have determined that the stop was based on founded suspicion. But a so-called *Terry* stop is by its very nature of temporary duration and limited in its intrusiveness on the liberty of the suspect being investigated. A lawful frisk does not always flow from a justified stop. Each element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined. The standard for justifying a frisk is whether a reasonably prudent person in the circumstances would be warranted in the belief that his or her safety or that of others was in danger. *Terry v. Ohio*, 392 U.S. at 27, 88 S.Ct. at 1883. If the stop is based on founded suspicion and the officer has reason to believe that the suspect is armed and dangerous, the officer may conduct a limited weapons search. *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed. 2d 612 (1972).

In defining the scope of the stop and inquiry of the suspects, courts have tried to balance the need to conduct an investigation on less than probable cause with the constitutional rights of the individual detained on less than probable cause. A valid stop can include the momentary restriction on a person's freedom of movement in order to maintain the status quo while making an initial inquiry. *United States v. Patterson*, 648 F.2d 625, 633 (9th Cir.1981). Otherwise, an officer could not perform a preliminary investigation of an alleged wrongdoing. The scope of the inquiry following a stop and the detention is a fact-specific determination. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). The facts of this case indicate that the initial investigatory stop provided no basis for the subsequent detention and frisk. The events that transpired after the stop unreasonably interfered with Thomas' personal liberty and were violative of the Fourth Amendment.

■ There is nothing inherently suspicious in the fact that Thomas "got out [of his car] without being asked to do so." Appellant's opening brief, at 4. Officer Siegel pulled his patrol car in front of Thomas' car, making it impossible for Thomas to freely leave. In *United States v. Kerr*, 817 F.2d 1384 (9th Cir.1987), an officer effected a stop in exactly the same way that Officer Siegel did. We stated that the suspect "stopped and exited his car primarily in response to Deputy Hedrick's official appearance and conduct, rather than of his own volition." *Id.* at 1386. The government cannot suggest that this initial act by Thomas was a reason for Officer Siegel to fear for his safety.

■ Once Thomas got out of his car, Officer Siegel had a clear view of him and could see that Thomas did not match the description of either of the suspects, in that he was not wearing a plaid suit or a tan jacket. Although the arrest report indicates that the passenger in Thomas' car was wearing a camel-colored jacket, Officer Siegel apparently did not make that observation before making the stop, and there is nothing in the record to suggest that he observed the tan jacket during the detention and frisk of Thomas. Officer Siegel asked Thomas why he was in the bank parking lot and asked Thomas to identify himself. Both questions were permissible in the context of an investigatory stop.

Thomas responded to the first question with a plausible explanation and properly identified himself.

Nothing that occurred up to this point justified Officer Siegel's subsequent actions. The officer kept Thomas' driver's license as he positioned himself behind Thomas, so that both Thomas and the passenger in the car were within Officer Siegel's line of vision. The officer then asked Thomas whether he had any weapons. The record is silent on how long Officer Siegel waited for a response before he proceeded to pat Thomas down for weapons. In answer to the defense counsel's questions at the suppression hearing, Officer Siegel described in detail the factual circumstances surrounding the frisk of Thomas. Officer Siegel's attitude towards frisking Thomas is evident in the answer he gave to a question from the government at the suppression hearing:

Q. Officer Siegel, why did you pat Mr. Thomas down?

A. Basically for my own safety. I was by myself. I was investigating a felony. There were two of them, one of me. I didn't want any surprises. So I patted down just about everything under that kind of circumstance.

Q. Did the size or appearance of Mr. Thomas in any way contribute to your decision to patting him down?

A. Well, he is a pretty big guy. I patted him down because I didn't want to get in any trouble. I wanted to see what was in front of me, make sure they didn't have a weapon on them.

Officer Siegel had no reason to continue the detention after he had asked his initial investigatory questions, and yet he asked Thomas whether he had any weapons. Under the circumstances of this case, the question concerning weapons was not prompted by Officer Siegel's reasonable belief that Thomas might be armed and presently dangerous, and therefore, the ques-

tion was not justified.[8]  *Cf. United States v. Kennedy*, 573 F.2d 657, 659 (9th Cir. 1978). Nothing in the police dispatch suggested that either of the counterfeiting suspects was armed or dangerous. Nor were there any other circumstances that would lead to such a belief.

■ The physical appearance of a suspect may be significant if it contributes to the officer's reasonable belief that the suspect is armed, for example if the officer sees a suspicious bulge on the suspect's body or the clothes worn by the suspect could easily hide a weapon. *United States v. Hill*, 545 F.2d 1191, 1193 (9th Cir.1976) (a bulge in a suspect's clothing that was consistent with the presence of a weapon was a relevant factor in determining the validity of a frisk). There is no indication that Officer Siegel based his frisk of Thomas on such an observation. Finally, there is nothing to suggest that Thomas made any abrupt movements or engaged in suspicious, furtive behavior during the course of the investigation that would have justifiably prompted Officer Siegel to fear for his safety. *See United States v. Ullrich*, 580 F.2d 765, 769 (5th Cir.1978). Officer Siegel only suggests that he frisked Thomas because he was a "pretty big." An officer cannot simply frisk all "pretty big" guys without more specific objective reasons why the suspect posed a risk to the safety of the officer. The justification given by Officer Siegel for the frisk is not indicative of the reasoned approach to a frisk, based on an articulable fear for one's own safety, that was contemplated by *Terry* and *Adams*. It indicates a perfunctory attitude towards frisking a suspect once a justified stop has occurred.

The government argues that once Officer Siegel made the stop, he could do nothing else but continue his investigation: "He surely couldn't turn his back and walk away. If it was reasonable for him to investigate further by asking questions, it

---

**8.** The Court notes that it makes no ruling as to whether a question concerning weapons during the course of an investigatory stop and detention may be justified in other circumstances. The Court only holds that in cases such as this where the officer has less than a reasonable belief or suspicion directed at the person to be frisked, the manner in which the officer conducts the investigation or the posing of an unjustified question concerning weapons cannot be used to create the reasonable suspicion of fear for one's safety that is required under *Terry* to justify a frisk.

was reasonable for him to pat-down the exterior of [Thomas'] clothing." The way that Officer Siegel conducted his investigation, however, cannot be used to bootstrap a justification for the detention and frisk of Thomas. "The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked." *Ybarra v. Illinois*, 444 U.S. 85, 94, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979). If we followed the government's logic, all investigatory stops would necessarily include a frisk. Without any reason whatsoever, a police officer could routinely ask about weapons and frisk the individual under suspicion. Such a result would not only destroy the necessary distinction between the stop and frisk, but would indiscriminately subject countless individuals to the humiliation and invasiveness of a bodily frisk. We cannot allow the protections afforded by the Fourth Amendment to be tampered with so carelessly.

### V. *Conclusion*

We AFFIRM the district court's ruling granting the suppression motion on the grounds that the stop was based on founded suspicion but the subsequent detention and frisk were not justified.