**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

    v.

ANDREW MILTON FLATTER,
        *Defendant-Appellant.*

No. 04-30337

D.C. No.
CR-03-00159-FVS

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Fred L. Van Sickle, Chief Judge, Presiding

Argued and Submitted
June 5, 2006—Seattle, Washington

Filed August 9, 2006

Before: Robert R. Beezer, Richard C. Tallman, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

**COUNSEL**

Jeffry K. Finer, Spokane, Washington, for the defendant-appellant.

Stephanie J. Lister, Assistant United States Attorney, Spokane, Washington, for the appellee.

**OPINION**

BYBEE, Circuit Judge:

Appellant Andrew Flatter was a postal service employee suspected of stealing mail. Before questioning him, officers conducted a pat-down search pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), in order to ensure officer safety. The officers had no evidence that Flatter had a weapon; they conducted the search because they were concerned that their questioning might turn confrontational. The search revealed evidence of Flatter's guilt, which officers seized, and Flatter was charged with mail theft. The district court found that the search was lawful and, after a jury trial, Flatter was convicted and sentenced to probation. He now appeals, challenging the admission of the evidence and other evidentiary rulings. Because the officers had no reason to believe that Flatter was armed or dangerous, the officers had no grounds for the search. We

reverse the ruling of the district court and vacate Flatter's conviction.[1]

## I. FACTS

Following a report by the Veterans' Administration ("VA") that fourteen packages containing class II medications[2] had been lost, postal inspectors began to investigate the possibility of mail theft at a postal facility in Spokane, Washington, through which all of the lost packages had been routed. Postal inspectors soon focused their attention on Andrew Flatter after a cross-comparison of work schedules revealed that he was among a handful of workers who had been present on nearly all of the dates on which mail was lost.

The inspectors focused on Bay 32, which housed sorted mail that was to be delivered to Coeur d'Alene, Idaho. The mail in Bay 32 was in large, rectangular mesh boxes, sometimes referred to as "crab pots." Flatter's job was to drive a "tug," a motorized vehicle used to move the crab pots around the facility. Because the mail in Bay 32 was already sorted, there was no need for Flatter to have any contact with the mail beyond loading the crab pot into the appropriate truck in the loading bay.

The postal inspectors placed six decoy packages into two of the crab pots in Bay 32. The decoys were placed on top of the already-sorted mail so that they would be easily visible, both to Flatter and to the inspectors, who were observing the decoys by video camera. These decoys were white on the outside and gray on the inside, so that if someone were to tamper with the package, the gray interior would become exposed and the two contrasting colors would be easily visible.

---

[1]Because we reverse on the ground that the pat-down search was unlawful, we do not consider Flatter's other claims.

[2]Most class two medications sent out by the VA are painkillers.

Flatter heightened the investigators' suspicions by handling the mail in the crab pots while he moved them onto the mail truck bound for Coeur d'Alene. Investigators also saw Flatter remove a white object from one of the crab pots as he was pushing them onto the truck, but he then moved further inside the mail delivery truck, placing him out of the inspectors' view. Inspectors then observed Flatter emerge from the truck and leave the area with his tug.

The postal inspectors then sought to retrieve their six decoy packages from Bay 32's crab pots, but they were only able to locate five. They also noted that the five decoys they recovered had been moved from the spots in which they had originally been placed.

Inspectors Schaap and Sheppard then summoned Flatter, who was in the break room, to question him about the missing decoy envelope. They questioned him briefly in the hallway, and the inspectors found his responses to be evasive and unsatisfying, so they asked Flatter to come with them to the postal inspectors' office for further questioning. Flatter agreed, but requested that a union representative be present; one was provided. When they had arrived at the office, the inspectors told Flatter that he was not under arrest, and that he was free to leave. The inspectors told Flatter that, in order to ensure their own safety, they were going to pat him down for weapons. The inspectors then asked the union representative whether he had weapons; he answered that he did not. The inspectors later testified that they searched Flatter because they thought the situation might turn confrontational and the inspectors, Flatter, and the union representative were meeting in a small room.

Inspector Sheppard then proceeded to pat down Flatter. To facilitate the pat down, Sheppard had Flatter stand up. Sheppard stood behind Flatter while conducting the frisk. In the course of the check for weapons, Sheppard noticed at least half of an inch of white and gray plastic protruding from the

top of Flatter's rear pocket. The inspector immediately suspected that this was the missing decoy package. He therefore removed it from Flatter's pocket, placed it on the table, and resumed searching Flatter for weapons. The envelope proved to be the decoy.

Flatter was indicted on one count of mail theft in violation of 18 U.S.C. § 1709. Flatter moved to suppress the envelope on the ground that it had been obtained in violation of the Fourth Amendment. He also made a motion to depose the postal inspector witnesses. Both motions were denied. Flatter was convicted after a jury trial and sentenced to three years' probation and a $100 special penalty assessment. He now appeals the district court's denial of these two pre-trial motions, as well as certain evidentiary rulings that the district court made during his trial.

## II.   STANDARD OF REVIEW

We review a district court's denial of a motion to suppress de novo. *United States v. Beardslee*, 197 F.3d 378, 386 (9th Cir. 1999). The trial court's factual findings are reviewed for clear error. *United States v. Aukai*, 440 F.3d 1168, 1171 (9th Cir. 2006).

## III.   ANALYSIS

**[1]** In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court considered what constitutes sufficient suspicion under the Fourth Amendment to justify frisking an individual for weapons. Citing "the . . . immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him," the *Terry* Court ruled that a search for weapons need not be supported by probable cause. *Id.* at 23, 27. The Court held that a search for weapons is permissible "for the protection of the police officer, where he has reason to believe that he is dealing with an armed and

dangerous individual." *Id.* at 27; *see also Minnesota v. Dickerson*, 508 U.S. 366, 376 n.4 (1993); *Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979) ("The initial frisk of [the defendant] was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons."); *Adams v. Williams*, 407 U.S. 143, 146 (1972) ("The Court recognized in *Terry* that . . . '[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' he may conduct a limited protective search for concealed weapons." (citation omitted)).

Inspector Sheppard, who searched Flatter for weapons, testified that he conducted the pat down search of Flatter out of concern for officer safety. Sheppard stated that the interrogation room was small, placing the two officers in close quarters with Flatter and the union representative. He also stated that he feared that the questioning was likely to become confrontational, particularly because they suspected Flatter of a crime instead of a lesser form of misconduct. Sheppard stated that, in his experience, individual responses to such circumstances vary dramatically, and that he therefore felt it was prudent to insure that Flatter was not carrying any weapons. However, Sheppard admitted that "[he] had no idea if [Flatter] had weapons on him." Based on these facts, the district court upheld the weapons search.

These facts merely establish that *if* Flatter was armed, he would be dangerous; nothing in the record suggests that there was any reason to believe that Flatter actually *was* armed. Our prior cases have identified a wide variety of factors that can support a reasonable belief that an individual is armed. For example, we have given significant weight to an officer's observation of a visible bulge in an individual's clothing that could indicate the presence of a weapon. *See, e.g.*, *United States v. Alvarez*, 899 F.2d 833, 835, 839 (9th Cir. 1990);

*United States v. Allen*, 675 F.2d 1373, 1383 (9th Cir. 1982); *United States v. Hill*, 545 F.2d 1191, 1993 (9th Cir. 1976); *cf. United States v. Thomas*, 863 F.2d 622, 629 (9th Cir. 1988) (not finding reasonable suspicion that defendant was armed in part because officers did not see any suspicious bulges in his clothing). We have also considered sudden movements by defendants, or repeated attempts to reach for an object that was not immediately visible, as actions that can give rise to a reasonable suspicion that a defendant is armed. *See, e.g.*, *United States v. Flippin*, 924 F.2d 163, 164-66 (9th Cir. 1991); *cf. Ybarra*, 444 U.S. at 93 (not finding reasonable suspicion where defendant, "whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening"). We also consider the nature of the crime suspected; indeed, some crimes are so frequently associated with weapons that the mere suspicion that an individual has committed them justifies a pat down search. *See, e.g.*, *Terry*, 392 U.S. at 28 (robbery); *Hill*, 545 F.2d at 1193 (same); *United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1086 (9th Cir. 2000) (large-scale narcotics dealing); *United States v. Post*, 607 F.2d 847, 851 (9th Cir. 1979) (same); *cf. United States v. Mattarolo*, 209 F.3d 1153, 1158 (9th Cir. 2000) (finding reasonable suspicion, in part because nighttime burglary is a crime frequently committed while armed); *Thomas*, 863 F.2d at 629 (not finding reasonable suspicion, in part because counterfeiting is not a crime frequently committed while armed).

**[2]** Here, however, officers had absolutely no reason to believe that Flatter was armed. They did not observe any bulges in his clothing. Nothing in Flatter's demeanor aroused the officers' concerns for their safety, or suggested that he might be armed; he did not act in a threatening manner at any time, nor were the officers aware of any past violent conduct. Mail theft by postal employees is not a crime that is frequently associated with weapons, such as robbery or large-

scale drug dealing. Nor does the record suggest that Flatter had any idea he was under investigation; he was therefore no more likely to have been armed that day than to have been armed on any other work day. Because the officers had no reason to suspect that Flatter was armed and dangerous, we hold that the pat down violated the Fourth Amendment.

The government suggests in its brief that officers would have discovered the envelope even without the frisk for weapons because the parties were in close quarters and the envelope was sticking out of Flatter's rear pants pocket. The record does not support this contention. Flatter's vest obscured his waistline, so that the envelope was not visible until Flatter either lifted his arms pursuant to the search or the officer lifted the vest to inspect his waistband for weapons. Indeed, Flatter had already led the officers around the postal facility for some time and neither officer had noticed the envelope sticking out of Flatter's pocket. The evidence thus cannot be admitted under the inevitable discovery doctrine.

**[3]** Since the decoy envelope was found as a direct result of the illegal weapons search, it must be suppressed as the fruit of the poisonous tree.

## IV. CONCLUSION

We hold that the postal inspector violated the Fourth Amendment by frisking Flatter for weapons without a reasonable belief that he was armed and dangerous. In light of our holding, we do not consider Flatter's other claims. Accordingly, we reverse the judgment of the district court, vacate Flatter's conviction, and remand for a new trial. Conviction VACATED; REVERSED and REMANDED.