**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>

UNITED STATES OF AMERICA,<br>
*Plaintiff-Appellee*,<br><br>

v.<br><br>

TAMARAN EDWARD BONTEMPS,<br>
*Defendant-Appellant.*

</td><td>

No. 19-10195<br><br>

D.C. No.<br>
2:18-cr-00099-JAM-1<br><br><br>

OPINION

</td></tr>
</table>

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted May 11, 2020
San Francisco, California

Filed October 13, 2020

Before: Ryan D. Nelson and Daniel A. Bress, Circuit
Judges, and James S. Gwin,* District Judge.

Opinion by Judge Bress;
Dissent by Judge Gwin

---

*The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed a criminal judgment in a case in which the district court denied the defendant's motion to suppress evidence, and the defendant entered a conditional guilty plea to being a convicted felon in possession of a firearm.

Police detained the defendant after observing a bulge under his sweatshirt that likely indicated a concealed firearm, which is presumptively unlawful to carry in California. After searching the defendant, a convicted felon with an outstanding felony warrant, police determined he was carrying a loaded gun in a shoulder holster. The panel held that the district court did not clearly err in crediting an officer's testimony that he observed on the defendant a "very large and obvious bulge" that suggested a concealed firearm. The panel further held that reasonable suspicion supported the stop, and that the district court therefore properly denied the defendant's motion to suppress evidence found during the search.

Dissenting, District Judge Gwin wrote that, without other corroborating evidence, a sweatshirt bulge alone did not give an objectively reasonable and particularized suspicion to stop the defendant.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Ann C. McClintock (argued), Assistant Federal Defender; Heather E. Williams, Federal Defender; Federal Defender's Office, Sacramento, California; for Defendant-Appellant.

David Spencer (argued) and Timothy H. Delgado, Assistant United States Attorney; Camil A. Skipper, Appellate Chief; McGregor W. Scott, United States Attorney; United States Attorney's Office, Sacramento, California; for Plaintiff-Appellee.

---

**OPINION**

BRESS, Circuit Judge:

Police detained Tamaran Bontemps after observing a bulge under his sweatshirt that likely indicated a concealed firearm, which is presumptively unlawful to carry in California. After searching Bontemps, a convicted felon with an outstanding felony warrant, police determined he was carrying a loaded gun in a shoulder holster. The question in this case is whether police had reasonable suspicion of illegal conduct sufficient to justify the stop. We hold that the district court did not clearly err in crediting an officer's testimony that he observed on Bontemps a "very large and obvious bulge" that suggested a concealed firearm. We further hold that reasonable suspicion supported the stop. The district court therefore properly denied Bontemps's motion to suppress evidence found during the search.

## I

We describe the events surrounding the stop based on the testimony of Vallejo Police Department Detectives Jarrett Tonn and Kevin Barreto at a hearing on Bontemps's motion to suppress, as well as Tonn's and Barreto's police reports and bodycam footage.

On April 18, 2018, Tonn and Barreto were patrolling Vallejo in a black police SUV. Barreto drove while Tonn sat in the front passenger seat. At around 3:51 p.m., the detectives observed a group of four young African American men walking eastbound on Robles Way, a two-lane road with a center turn lane in a mixed residential/commercial area (at one point Tonn described Robles Way as "a two-lane road on either side of the small concrete divide," but the road was in fact narrower and had no concrete divide).

As the detectives drove past the group, Barreto noticed that one of the men, Quinton Mills, appeared to be carrying a concealed handgun in the pouch pocket of his sweatshirt. Barreto made a U-turn so that the officers could get a closer look. At this point, the men were walking eastbound on the south side of the street, and the officers were driving five to seven miles per hour westbound. Detective Barreto slowed the vehicle further as they approached the group. Although Barreto already "wasn't going fast," he "slowed down fairly rapidly" "so [the officers] could look at them."[1]

From the passenger seat, Detective Tonn could "very clearly" see the four men on the sidewalk, who were not

---

[1] The dissent contends that Tonn and Barreto testified inconsistently. That is not the case. As the district court recognized, Tonn merely began his account once the officers had already made their first U-turn and were driving westbound.

"very far away" on the other side of the street. Tonn observed that Bontemps, who was walking in front with Mills, also "had obvious indicators of having a firearm." According to Tonn, based on his "training and experience as a police officer," both Bontemps and Mills had "bulges in parts of their body" that were "consistent with carrying a firearm in public."

In particular, Bontemps, who was wearing a light gray sweatshirt that was partially zipped up, "had a very obvious bulge on his left side just above the waist area, kind of halfway maybe between his waist and his left armpit." Due to this "very large and obvious bulge in Mr. Bontemps' sweatshirt on his left side above his waist," as well as Detective Tonn's training and his encounters with "numerous people with firearms," Tonn believed Bontemps was carrying a concealed gun.

After the SUV passed by the group, the detectives turned around and pulled up behind the four men, exited the vehicle, and ordered the group to stop and sit on the curb. All four complied. Mills had his hands in his front pocket, where Detective Barreto suspected he was concealing a firearm. Barreto unholstered his service pistol, held it by his side, and told Mills to remove his hands from the pocket. Barreto then ordered Mills to keep his hands up, reached into Mills's sweatshirt pocket, and removed a 9mm Glock 19 handgun with a live round in the chamber. (A later search uncovered a twenty-two-round magazine with nine live rounds in Mills's pants pocket.)

As Barreto was dealing with Mills, Bontemps became argumentative and began yelling at the officers and cars passing by. As the situation escalated and the officers called for backup, Detective Tonn deployed his Taser on Bontemps to subdue him. Tonn, who also had his gun drawn, ordered

the men to lie on their stomachs. The detectives then handcuffed and searched Bontemps, uncovering a loaded .40 caliber Glock 22 handgun concealed in a shoulder holster on the left side of his body. The handgun's serial number had been drilled off, rendering it unreadable. When officers ran Bontemps's information, they discovered he was on felony probation for carrying a loaded firearm in public and had an outstanding warrant for a probation violation.

In May 2018, a grand jury returned an indictment charging Bontemps with one count of being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Bontemps moved to suppress the evidence gathered during the stop, including his concealed firearm, on the ground that officers lacked reasonable suspicion to stop him. The district court held a hearing at which both Detectives Tonn and Barreto testified. Defense counsel cross-examined both officers at the hearing.

The district court denied Bontemps's suppression motion, finding that reasonable suspicion justified the stop. The court determined that the stop began when the detectives exited the SUV and ordered the group to stop and sit on the curb. The court then concluded that "the detectives had an objectively reasonable, articulable suspicion at the stop's inception" based on the "visible bulge above Bontemps's waist."

In reaching this conclusion, the district court cited Detective Tonn's police report, which stated that he observed "'a bulge on [Bontemps's] left waist/side area,' and 'feared Bontemps was armed.'" The court also credited Detective Tonn's testimony that "he could see the bulge in Bontemps's jacket from the car," and that, "based on his training and experience," Tonn "believed Bontemps was carrying a firearm." Finally, the court pointed to Detective

Barreto's bodycam footage that confirmed "there was a bulge on the left side of Bontemps's jacket, and that the bulge was visible from inside the patrol car."

Bontemps entered a conditional guilty plea that reserved his right to appeal the district court's denial of his motion to suppress. The district court entered judgment and sentenced Bontemps to 57 months' imprisonment. Bontemps timely appealed.

## II

### A

Under *Terry v. Ohio*, 392 U.S. 1 (1968), "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). We review determinations of reasonable suspicion de novo, but "factual findings underlying those determinations are reviewed for clear error, giving 'due weight to inferences drawn from those facts by resident judges and local law enforcement.'" *United States v. Guzman-Padilla*, 573 F.3d 865, 881 (9th Cir. 2009) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

In California, evidence that a person is concealing a firearm provides an adequate basis to suspect illegal activity, and thus grounds to initiate a *Terry* stop. Circuit precedent is clear on this point. In *Foster v. City of Indio*, 908 F.3d 1204 (9th Cir. 2018) (per curiam), we held that "[w]here state law makes it generally unlawful to carry a concealed weapon without a permit, a tip that a person is carrying a concealed firearm raises a reasonable suspicion of potential criminal activity" under *Terry*. *Id.* at 1215. That is so "even

if the tip does not state that the person is carrying the firearm illegally or is about to commit a crime." *Id.*

Under California law, which Bontemps does not challenge here, it is generally illegal to carry a concealed firearm in public. *See* Cal. Penal Code § 25400. In *Foster*, we held that "[g]iven the insignificant number of concealed carry permits issued in California, a reasonable officer could conclude that there is a high probability that a person identified in a 911 call as carrying a concealed handgun is violating California's gun laws." 908 F.3d at 1216. We concluded the officer in *Foster* could therefore reasonably make a *Terry* stop based on this information. *Id.* at 1217. We held similarly in another more recent case. *See United States v. Vandergroen*, 964 F.3d 876, 881–82 (9th Cir. 2020) (holding that officers had reasonable suspicion to justify a stop based on a 911 call reporting that the defendant had a gun "on him" because "possessing a concealed weapon" is "presumptively unlawful in California").

Under our case law, the reasonable suspicion analysis is different in a jurisdiction that has different rules for carrying concealed weapons. *See United States v. Brown*, 925 F.3d 1150, 1153–54 (9th Cir. 2019) (holding that a tip that an individual "had a gun" in Washington did not support a reasonable suspicion of wrongdoing because carrying a firearm is "presumptively lawful in Washington"). But Bontemps was carrying a concealed (not to mention loaded) weapon in California, and such conduct is "presumptively a crime" in that State. *Vandergroen*, 964 F.3d at 881.

That is not the end of the matter, however, because there is still the question whether officers had reasonable suspicion that Bontemps was concealing a firearm. The district court found they did, based on Detective Tonn's testimony that Bontemps had a "very large and obvious

bulge" on his sweatshirt that likely indicated a concealed firearm. Our existing case law in this area supports the district court's decision below. That is because our prior cases "have given significant weight to an officer's observation of a visible bulge in an individual's clothing that could indicate the presence of a weapon." *United States v. Flatter*, 456 F.3d 1154, 1157–58 (9th Cir. 2006) (citing *United States v. Alvarez*, 899 F.2d 833, 835, 839 (9th Cir. 1990); *United States v. Allen*, 675 F.2d 1373, 1383 (9th Cir. 1980); and *United States v. Hill*, 545 F.2d 1191, 1193 (9th Cir. 1976)). We have also noted that "[i]n assessing the totality of the circumstances" for reasonable suspicion, "relevant considerations may include: observing a visible bulge in a person's clothing that could indicate the presence of a weapon." *Thomas v. Dillard*, 818 F.3d 864, 877 (9th Cir. 2016) (citing *Flatter*, 456 F.3d at 1157).

Bontemps points out that none of our prior cases found reasonable suspicion based solely on a bulge suggestive of a firearm. But none of these cases presented that question, either. And none suggested that a bulge indicative of a firearm would be insufficient to justify a *Terry* stop in a jurisdiction like California.

Bontemps initially argued on appeal that a bulge alone is necessarily unreliable because the bulge could be anything (his examples: candy, a gift, or a "post-mastectomy prosthetic"). But Bontemps ultimately acknowledged at oral argument what is, of course, true: that in some circumstances a bulge could be an obvious indicator of a concealed firearm—for example, a bulge underneath a tight-fitting shirt that clearly reflects the distinct outline of a large gun.

Precedent suggests—and common sense confirms— what we now hold here: a bulge that appears to be a concealed firearm can form the basis for a *Terry* stop in a

jurisdiction where carrying a concealed weapon is presumptively unlawful. This holding accords not only with our past cases discussed above but also with the basic mode of analysis under *Terry*, in which courts "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

By contrast, Bontemps's suggestion that a bulge could never provide reasonable suspicion for a *Terry* stop to investigate a potential concealed weapon is not justified under *Terry*. The reasonable suspicion standard "is not a particularly high threshold to reach" and reflects a "'commonsense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) (alterations omitted) (quoting *Ornelas*, 517 U.S. at 695). One can easily imagine bulges that are likely indicative of concealed firearms, especially to a police officer's trained eye. An ironclad rule precluding *Terry* stops in those circumstances absent further indicia of wrongdoing would improperly hamstring officers in their investigation of patently unlawful activity.

Such a rule would also run counter to our precedent involving *Terry* stops for concealed weapons. We have previously held, as explained above, that a reliable 911 tip "that a person is carrying a concealed firearm raises a reasonable suspicion of potential criminal activity" under *Terry*. *Foster*, 908 F.3d at 1215. Since that is the case, *Terry*'s reasonable suspicion standard should likewise permit this result based on an officer's own observation,

grounded in law enforcement experience, that a person is potentially carrying a concealed weapon under his clothing due to the bulge that a firearm creates. *See Arvizu*, 534 U.S. at 273.

Finally, that a bulge can give rise to reasonable suspicion of a concealed firearm inheres in how illicit weapons are typically held on the person. A concealed weapon is necessarily obscured by something, typically clothing. A rule that always required more than a suggestive bulge, or that required the concealed weapon to be revealed, would run counter to *Terry*'s fact-based standard and pose obvious safety concerns. *See also Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (per curiam) (upholding under *Terry* a pat-down after a vehicle stop because "[t]he bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer").

## B

Even if a bulge indicating a concealed weapon can be sufficient to justify a *Terry* stop, there remains the issue whether the officers in this case had reasonable suspicion to detain Bontemps based on the particular bulge that Detective Tonn observed on Bontemps's sweatshirt. *See United States v. Elsoffer*, 671 F.2d 1294, 1299 n.10 (11th Cir. 1982) (holding that a bulge provided a basis for arrest, but noting "[w]e do not hold that any bulge on a person would give probable cause for an arrest"). Here we return to the thrust of Bontemps's argument on appeal, which is that a bulge can be indicative of many things, and that officers could use perceived bulges as a pretext for making unjustified *Terry* stops.

On this point, Bontemps argues that the bulge in his sweatshirt was not suggestive of a firearm, citing cases involving searches premised on bulges perceived to be drugs.  In those cases, courts held that the bulges in question did not create either reasonable suspicion to search or probable cause to arrest.  *See United States v. Jones*, 254 F.3d 692 (8th Cir. 2001); *United States v. Eustaquio*, 198 F.3d 1068 (8th Cir. 1999).  Similarly, in *United States v. Job*, 871 F.3d 852, 861 (9th Cir. 2017), and where a *Terry* frisk uncovered drug paraphernalia, we held that police lacked reasonable suspicion to perform the search.  That the defendant's "pants appeared to be 'full of items' and he appeared nervous d[id] not support the conclusion that he was engaged in criminal activity."  *Id.*

Cases involving "drug bulges," however, present somewhat different considerations than "gun bulges" under the fact-based *Terry* inquiry.  While guns are made of rigid materials (such as metal or hard plastics) and possess a relatively distinctive shape, drugs or packages of drugs come in different shapes and sizes, some quite small, soft, and nondescript.  *See Eustaquio*, 198 F.3d at 1071 (explaining that a bulge perceived to be drugs could indicate "any number of non-contraband items").

*Job*, for instance, did not even appear to involve a distinctive bulge at all.  *See* 871 F.3d at 861.  In that case, we expressly contrasted an observation that the defendant's pants appeared to be "full of items" with "'an officer's observation of a visible bulge in an individual's clothing that could indicate the presence of a weapon.'"  *Id.* (quoting *Flatter*, 456 F.3d at 1157).  Even so, some bulges have been held to create not only reasonable suspicion but even probable cause to arrest for drug possession.  *See Elsoffer*, 671 F.2d at 1299 ("In this case the unusual size and shape of

the bulge and, given its unusual size and shape, its abnormal position on Elsoffer's person alone provided not only reasonable suspicion but also probable cause for Elsoffer's arrest.").

While "drug" bulge cases involve some different considerations owing to the physical differences between pocketed drugs and concealed guns, Bontemps's overall concern with indiscriminate stops based on bulges alone remains a valid one in the concealed firearm context. And it is a concern of which we are mindful. In this case, however, we conclude that the district court's basis for finding reasonable suspicion was soundly supported in the record based on factual findings that were not clearly erroneous. *Guzman-Padilla*, 573 F.3d at 881. And those facts, taken together, created reasonable suspicion of criminal activity.

Detective Tonn testified that he saw a "very large and obvious bulge in Mr. Bontemps' sweatshirt" that appeared, based on his training and experience, to be a concealed firearm. After a hearing in which the district court was actively engaged and observed Tonn (and Barreto) testify, including after cross-examination, the district court credited Tonn's account based on Tonn's firsthand description of what he saw and his base of knowledge as a law enforcement officer.

Our fine colleague in dissent maintains that Tonn only testified to seeing a "non-descript bulge." That is not correct. Far from regarding the bulge as "non-descript," Tonn testified that Bontemps had a bulge on his "body consistent with my training and experience as a police officer, consistent with carrying a firearm in public." Tonn thus believed Bontemps was "carrying a firearm" based on the "obvious bulge in Mr. Bontemps' sweatshirt on his left side about his waist." Tonn repeatedly described the bulge

as a "very obvious bulge," a "very large and obvious protrusion coming from his left side," and "fairly obvious." The bulge was "obvious" to Tonn for one reason: it was an "obvious indicator[] of having a firearm."

The dissent is thus mistaken in claiming there was "no evidence to suggest that the bulge Detective Tonn saw in this case was anything special." And the dissent is equally mistaken in asserting that "Detective Tonn never described the bulge as obviously a firearm." That was the central point Tonn repeatedly made throughout his testimony. While our cases "have given significant weight to an officer's observation of a visible bulge in an individual's clothing that could indicate the presence of a weapon," *Flatter*, 456 F.3d at 1157–58, the dissent gives Tonn's observations no weight.

"[T]o reverse a district court's factual findings as clearly erroneous, we must determine that the district court's factual findings were illogical, implausible, or without support in the record." *United States v. Spangle*, 626 F.3d 488, 497 (9th Cir. 2010) (citing *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)). Moreover, "[w]here testimony is taken, we give special deference to the district court's credibility determinations," *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008), and generally "cannot substitute [our] own judgment of the credibility of a witness for that of the fact-finder." *United States v. Durham*, 464 F.3d 976, 983 n.11 (9th Cir. 2006).

Nothing about the district court's central factual finding was "illogical" or "implausible." *Spangle*, 626 F.3d at 497. On the contrary, it enjoys ample support in the record. From his vantage point in a slowly moving SUV that had decelerated further to get a good look, Tonn could "very clearly" see Bontemps, who was not "very far away" on the opposite side of a residential street in broad daylight.

Bontemps was also carrying a gun in a shoulder holster, and thus on a part of his body where other items would be less likely to be held (this was not the pants "full of items" that we considered in *Job*). Tonn also immediately recognized the bulge as a gun based on his training and "all the numerous people I've stopped."

While the fact-driven nature of a *Terry* analysis does not mean any one of these factors is necessary to justify an investigatory stop such as this, they were sufficient in this case when considered together. *See Arvizu*, 534 U.S. at 273; *Thomas*, 818 F.3d at 877. The dissent is thus incorrect in implying that our holding allows any bulge of any kind to justify a *Terry* stop. Our holding is instead that a bulge suggestive of a firearm can be sufficient to create reasonable suspicion, and that in this case there was ample evidence from which to conclude that Bontemps's "obvious" bulge was likely a concealed firearm.

In arguing for a contrary result, the dissent ignores the district court's role as factfinder, *Spangle*, 626 F.3d at 497, the record in this case, and the more modest reasonable suspicion standard, which is less than probable cause and "considerably short" of a "preponderance of the evidence," *Arvizu*, 534 U.S. at 274. The dissent labors to manufacture supposed inconsistencies between the officers' testimony and their police reports. But the officers' accounts were consistent on the core points, and there is no requirement that the initial police reports and later testimony of two different officers all be mirror images in every picayune respect, especially when the officers were focused on multiple suspects at the same time. Tellingly, Bontemps does not raise any of the dissent's claimed "inconsistencies" in his briefing in this court. Moreover, none of the minute inconsistencies the dissent seizes upon undermines Tonn's

central and well-supported testimony that Tonn observed on Bontemps a bulge that was "obviously" suggestive of a concealed firearm. The dissent's related contention that we rely on "facts not found in the record" is unfortunate and completely inaccurate. Everything we have set forth comes from the record below.[2]

The officers' bodycam footage also clearly supports Tonn's testimony. This footage is not necessary to our holding, but we note it as corroborative. The district court found, and the parties do not dispute, that the seizure began when the officers ordered the men to stop. The bodycam footage for the most part depicts events after the seizure had already occurred. But we agree with the district court that this footage plainly supports Tonn's testimony because it shows an obvious bulge on Bontemps's sweatshirt that distinctly resembles the shape of a firearm. And contrary to the dissent, the bodycam footage shows a gun-shaped bulge both when Bontemps's hands were raised and when they were down. In short, this was simply not a case where Bontemps was stopped for a nondescript bulge, with officers lucking upon a gun. *Cf. Job*, 871 F.3d at 861.

---

[2] Other points the dissent advances confirm its departure from governing legal standards. For example, the dissent finds it "peculiar that Detectives Barreto and Tonn did not say anything to each other about their suspicions" before initiating the stop. But there is no record on this point one way or the other (the bodycam footage starts after the officers decide to initiate the stop and the officers were not asked about their discussions with each other). In any event, the police reports and testimony clearly show that both officers independently believed a stop was justified. There is also no requirement that officers making split-second decisions in the field first verbally memorialize their mutual agreement to stop persons whom they validly believe are violating the law.

Bontemps seeks to avoid this conclusion by citing statistics concerning frisks in other jurisdictions. *See* David Rudovsky & David A. Harris, *Terry Stops-and-Frisks: The Troubling Use of Common Sense in a World of Empirical Data*, 79 Ohio State L.J. 502, 541–42 (2018). For example, he cites a study of 2.3 million frisks for weapons in New York City between 2004 and 2012, in which weapons were reportedly uncovered in 1.5% of the searches. *Id.* at 541; *Floyd v. New York City*, 959 F. Supp. 2d 540, 558 (S.D.N.Y. 2013). Bontemps also cites data from New York City in the years 2014 to 2016, reportedly showing that "of 220 frisks based on a 'bulge,' only one weapon was seized, a hit rate of less than 0.5%." Rudovsky & Harris, *supra*, at 542.

These statistics do not undermine the district court's factual findings here. The statistics were not introduced below, and we generally "consider only the district court record on appeal." *Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003). Regardless, they do not change the outcome of this case. Even taking the data at face value, statistics on the percentage of weapons recovered during *Terry* stops generally (and in a different jurisdiction) say nothing about whether the officers in this case had reasonable suspicion to detain Bontemps based on the "very large and obvious bulge in Mr. Bontemps' sweatshirt" that a trained detective observed. And Bontemps nowhere explains whether the data he cites concerning "220 frisks based on a bulge" involved bulges as distinctive as the one here.

Permitting aggregate data to dictate the result in this case would risk abrogating our duty to examine "each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (quoting *Cortez*, 449 U.S. at 417). We can acknowledge that the studies Bontemps cites raise valid

questions, while at the same time holding that the district court in this case—based on the officer testimony it permissibly credited—did not err in denying Bontemps's motion to suppress.

For the foregoing reasons, the judgment is

**AFFIRMED.**

---

GWIN, District Judge, dissenting:

The *Terry* reasonable suspicion standard requires Detective Tonn have had an objective and particularized basis to believe that Bontemps had committed or was about to commit a crime.

The district court found a reasonable suspicion for the stop based on only one detective's testimony that he saw a non-descript sweatshirt bulge as Bontemps walked on the opposite side of the street. The detective said that he believed the bulge suggested a concealed firearm.

The detective said he could see the bulge from a vehicle passenger seat travelling in the opposite direction. The detective testified that he did not see any exposed weapon barrel or other firearm part. Instead, he testified that he only saw a non-descript sweatshirt bulge.

The detective stopped Bontemps even though the officers had received no background reports of any criminal activity. The detective stopped Bontemps mid-afternoon and in a general mixed commercial-residential area.

Without other corroborating evidence, a sweatshirt bulge alone did not give an objectively reasonable and particularized suspicion to stop Bontemps. I respectfully dissent.

I

On April 18, 2018, near 4:00 pm, Vallejo Detectives Barreto and Tonn patrolled a mixed commercial-residential area in a police SUV. Detective Barreto drove. Detective Tonn rode in the passenger seat.

The majority and the district court find the detectives gave consistent travel path descriptions before the stop and arrest location. The majority finds "Tonn merely began his account once the officers had already made their first U-turn and were driving westbound"[1] However, the detectives' accounts are not consistent.[2]

---

[1] Maj. Op. 4 n.1.

[2] Detective Barreto's police report statements conflict with Barreto's suppression hearing testimony. In his report, he wrote that the detectives were *driving on Robles Way, approaching Glen Cove Parkway*. At the suppression hearing, he testified that the detectives *waited at a red light on Glen Cove Parkway and made a left turn onto Robles Way*. Similarly, in his police report, he wrote that the detectives drove past the group once, making a single U-turn to approach the group from behind. But at the hearing, Barreto testified that the detectives drove past the group twice, making two U-turns before pulling over to stop the group.

Moreover, some of Detective Tonn's testimony simply cannot square with Detective Barreto's testimony. For example, Detective Tonn testified that when he noticed the group the detectives "were driving slow" because "[they] *had just pulled out of a parking lot*," not that they had just made a U-turn. Likewise, Detective Tonn testified that "Detective Barreto slowed down fairly rapidly, even though he wasn't

The detective testimony differences do not end with the path to the stop. The detectives also relied on different observations to justify the stop.

Before the stop, Detective Barreto did not notice anything suspicious regarding Appellant Bontemps. Instead, Barreto testified that he first passed Bontemps's group from behind. Detective Barreto testified that as the detectives passed the group from behind, he looked right from the driver's seat, past Detective Tonn, out the window, and noticed that Quinton Mills—and only Quinton Mills—had something weighing down the front waist area of his sweatshirt.

Only Detective Tonn testified to noticing anything suspicious about Bontemps. And Tonn testified that Detective Barreto had already driven down the street, made a U-turn to drive back facing the Bontemps's group before he observed anything suspicious regarding Bontemps.

After making the U-turn to face Bontemps from across the road, Detective Tonn testified that he looked left from the passenger's seat, past Barreto, out the front window, across the road, and noticed that two men in the group had

---

going fast, so we could look at [the group.]" But Detective Barreto never mentions anything about slowing down the SUV to get a closer look. Instead, Barreto testified that after initially observing the group, that "[a]t that time I turned the car around, came back at the individuals and circled back for [sic] around behind them."

To me, it does not seem that the detectives began their accounts at different points in time. Rather, it seems that the detectives have different accounts.

sweatshirt bulges—Quinton Mills and Appellant Tamaran Bontemps.

It is peculiar that Detective Tonn saw a bulge in Bontemps's sweatshirt when Detective Barreto did not. Detective Barreto noticed Mills as the SUV passed the group from behind and on the same side of the road; Detective Tonn noticed Mills and Bontemps as the SUV passed the group on the opposite side.

It is even more peculiar that Detectives Barreto and Tonn did not say anything to each other about their suspicions. Neither detective testified that the other detective said anything about firearm concerns before initiating the stop. Indeed, Detective Barreto states in his report that the first time he noticed and alerted Detective Tonn of Bontemps's firearm was well after Bontemps had complied with the detectives' order to sit on the curb.

The detectives did give similar accounts of how the stop and arrest unfolded.

Detective Barreto testified that he turned the SUV after he suspected Mills, but not Appellant Bontemps, had a concealed firearm. Detective Tonn agreed that Barreto made a U-turn at one point. The detectives then approached the Mills-Bontemps group from behind. The detectives agree that Barreto exited the car first and called out for the men to stop. And they agree that the men complied with the detectives' orders and sat on the curb.

Barreto and Tonn searched Mills and Bontemps and discovered firearms on both men. The detectives arrested both men.

On July 17, 2018, Bontemps moved to suppress the evidence as the product of an illegal search. After a suppression hearing, the district court denied the suppression motion. Bontemps appeals this denial.

In denying the suppression motion, the district court found sufficient evidence to create a reasonable suspicion that Bontemps was carrying a concealed firearm. Because California allows so few concealed-carry permits, weapon possession becomes presumptively illegal in California.[3]

In addition to Tonn's statements, the district court relied upon Detective Barreto's bodycam footage.[4] However, the bodycam footage did not show Bontemps as Detective Tonn would have seen Bontemps before the stop—across the road and while Bontemps walked opposite Tonn's direction.

Instead, the district court relied upon on footage where Bontemps's arms are raised from his side. The district court found that the footage "confirms that there was a bulge on the left side of Bontemps's jacket, and that the bulge was visible from inside the patrol car."

The majority concludes that the district court did not clearly err when it found, and based upon Tonn's testimony alone, that Bontemps's sweatshirt's nondescript bulge created reasonable suspicion to stop Bontemps.[5]

---

[3] *See Foster v. City of Indio*, 908 F.3d 1204, 1216 (9th Cir. 2018).

[4] "Detective Barreto testified that he turned on his bodycam shortly before exiting the patrol vehicle." *United States v. Bontemps*, No. 18-099, at 5 (E.D. Cal. Oct. 19, 2018) (order denying motion to suppress).

[5] Maj. Op. 13–14.

I disagree that sufficient evidence supported a reasonable suspicion for the *Terry* stop.

## II

The majority's reasonable suspicion analysis is mistaken.

Today, the majority holds that "a bulge suggestive of a firearm can be sufficient to create reasonable suspicion, and that in this case there was ample evidence from which to conclude that Bontemps's 'obvious bulge was likely a concealed firearm."[6] This "ample evidence" is "Detective Tonn's testimony that Bontemps had a 'very large and obvious bulge' on his sweatshirt that likely indicated a concealed firearm."[7]

A sweatshirt bulge alone, especially one as non-descript as here, and without any associated suspicious conduct or circumstances cannot create a reasonable suspicion of criminal activity.

Detective Tonn provides limited support for his conclusion that *Bontemps's* bulge was a concealed firearm.

In his police report, Tonn wrote: "[Co-Defendant] *Mills* had something very heavy sagging in his front sweater pocket. The weight appeared greater than a cell phone and was *consistent with a firearm*. Bontemps had a bulge on his left waist/side area." Detective Tonn's report says that

---

[6] Maj. Op. 15.

[7] Maj. Op. 8–9.

*Mills's* bulge was consistent with a firearm, but not Bontemps's.

At the suppression hearing, Tonn testified that "[t]wo of the persons in the group had bulges in parts of their body consistent with my training and experience as a police officer, consistent with carrying a firearm in public[.]" He testified, "I saw Mr. Bontemps, he had a very obvious bulge on his left side just above the waist area, kind of halfway maybe between his waist and his left armpit." Later in the hearing, Tonn reiterated that there was a "very large and obvious bulge in Mr. Bontemps's sweatshirt on his left side above his waist[.]"

Detective Tonn concluded that Bontemps's sweatshirt bulge was a firearm bulge, not because it was distinctly shaped or plainly appeared to be a firearm, but because the bulge was located in a position that Tonn believed consistent with carrying a firearm in public.

The detectives found Bontemps cradled a firearm in a shoulder holster. In the broad majority of firearm cases, shoulder holsters seldom see use. Bulges in the side-chest area could be various innocuous items.

The majority takes issue with my characterizing Bontemps's bulge as non-descript. But the record supports the characterization.

Compare Detective Barreto's description of Mills's bulge with Detective Tonn's description of Bontemps's bulge.

In the police report filed on arrest day, Detective Barreto wrote about *Mills*, "I saw that there was a noticeable bulge in this pocket and *it was in the shape that appeared to be a*

*firearm*." Likewise, Barreto testified about Mills, "[a]s we passed by, I looked to my right and saw a subject wearing a sweater with a front pocket. In the front pocket, *it appeared there was the shape of like a handgun* sort of pressing down on the pocket from the inside." Barreto states that Mill's bulge was firearm shaped.

Contrastingly, Tonn never describes Bontemps's bulge as firearm shaped.

The majority emphasizes Tonn described Bontemps's bulge as obvious.[8] But Detective Tonn never described the bulge as obviously a firearm. The majority also relies on the detectives' bodycam footage. The majority states " [the] footage plainly supports Tonn's testimony because it shows an obvious bulge on Bontemps's sweatshirt that *distinctly resembles the shape of a firearm*."[9]

But the bodycam footage is not what Detective Tonn saw before the stop. Every day we see individuals walking down sidewalks. Almost never do we see people strolling down sidewalks with their arms raised in a surrender position.

As the majority acknowledges, "[t]he bodycam footage for the most part depicts events after the seizure had already occurred," and after the point at which the Fourth Amendment requires reasonable suspicion for a stop.[10]

Moreover, the bodycam footage does not show Bontemps's position when Tonn made his observations.

---

[8] Maj. Op. 13–15.

[9] Maj. Op. 16 (emphasis added).

[10] Maj. Op. 16.

Rather, it shows Bontemps walking towards the detectives, within one car lane width and within 12 feet, and with his hands out at his side.

Further, the bodycam footage was not taken from the passenger seat of the patrol car, through the front window, past Officer Barreto, and across the road. Instead, it shows the perspective from a standing and nearby officer.

Contrary to the majority's insistence, this is a case where an individual was stopped for a non-descript bulge with officers lucking upon a gun.[11]

In this *Terry* stop, context is crucial. The stop occurred at 4:00 pm on a sunny day near a commercial area. Detectives Barreto and Tonn had received no earlier reports of nearby criminal activity.[12] The four detained individuals simply walked down a street in an otherwise non-threatening manner. No other identified activity supported suspicion that criminal activity was afoot.

In my view, seeing a non-descript bulge without more should not allow police officers to stop and frisk citizens. And the majority's holding gives license to stop and frisk

---

[11] Maj. Op. 16.

[12] The majority states that "our prior cases 'have given significant weight to an officer's observation of a visible bulge in an individual's clothing that could indicate the presence of a weapon.'" Maj. Op. 9. In all the cases the majority cites, there was nearby criminal activity in addition to the suspect's bulge. *See United States v. Flatter*, 456 F.3d 1154, 1155–1156 (9th Cir. 2006) (mail theft); *United States v. Alvarez*, 899 F.2d 833, 835 (9th Cir. 1990) (bank robbery); *United States v. Allen*, 675 F.2d 1373, 1377–1379 (9th Cir. 1980) (drug trafficking); *United States v. Hill*, 545 F.2d 1191, 1192–1193 (9th Cir. 1976) (bank robbery).

any citizen based upon nothing more than officer testimony that the officer had seen a bulge.

The majority brushes aside studies suggesting that officers are generally bad at predicting whether a suspect is armed and studies suggesting that reliance upon a bulge poorly predicts whether that suspect is actually armed.

One study looked at 2.3 million 2004–2012 New York City weapons frisks. There, officers discovered weapons in only 1.5% of frisks.[13]

Another study analyzed 220 2014–2016 Philadelphia weapons frisks based on visible bulges; In the 220 frisks, police seized only one weapon.[14]  The Philadelphia study suggests that bulges alone poorly associate with firearm possession[15]

The majority questions the study relevance by arguing that "Bontemps nowhere explains whether the data he cites concerning '200 frisks based on a bulge' involved bulges as distinctive as the one here."[16]  But as discussed above, if the majority disregarded the bodycam footage, as it should, then there would be no evidence to suggest that the bulge Detective Tonn saw in this case was anything special.

---

[13] *Floyd v. New York City*, 959 F. Supp. 2d 540, 558–559 (S.D.N.Y. 2013).

[14] David Rudovsky & David A. Harris, Terry Stops-and-Frisks: The Troubling Use of Common Sense in a World of Empirical Data, 79 Ohio. St. L.J. 502, 541–42 (2018).

[15] *Id.*

[16] Maj. Op. 17.

Ultimately, the majority concludes that "[t]hese statistics do not undermine the district court's factual findings here."[17] Maybe so.  But they do undermine the *legal sufficiency* of those factual findings.  It is imprudent to sanction a rule that allows a mere bulge to supply reasonable suspicion. Especially when the bulge does not accompany other suspicious factors.

In deciding this case, the majority misses an appropriate *de novo* reasonable suspicion review.  It improperly relies on irrelevant bodycam footage and crafts a rule based on facts not found in the record.

I respectfully dissent.

---

[17] Maj. Op. 17.