Filed 11/30/21  P. v. Miranda CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>DIEGO SANTOYO MIRANDA,<br><br>    Defendant and Appellant. | C092873<br><br>(Super. Ct. No. STK-CR-FE-COD-2020-0003456) |

Defendant Diego Santoyo Miranda appeals from a judgment entered following a no contest plea to carrying a concealed firearm (Pen. Code, § 25400, subd. (c)(6)).[1]  He argues:  (1) the trial court erred in denying his motion to suppress evidence (§ 1538.5) recovered as a result of his unlawful detention and de facto arrest; (2) he is entitled to have his probation term reduced to two years in light of the amendments Assembly Bill

---

[1]  All further undesignated statutory references are to the Penal Code.

No. 1950 (2019-2020 Reg. Sess.) (Assembly Bill 1950) made to section 1203.1 (Stats. 2020, ch. 328, § 2); and (3) he is entitled to four days' conduct credit for a total of eight days' presentence custody credit. The People concede the trial court erred in denying defendant's motion to suppress, that Assembly Bill 1950 applies retroactively to defendant's case, and that defendant is entitled to more custody credits.

We conclude: (1) the trial court did not err in denying defendant's motion to suppress; (2) Assembly Bill 1950 applies retroactively to this case; and (3) defendant should have been awarded four conduct credit days for a total of eight days' presentence custody credit. We will modify the judgment to limit defendant's probation term to two years and correct the custody credit allocation. We will affirm the judgment as modified.

FACTUAL AND PROCEDURAL BACKGROUND

The People's July 8, 2020, information charged defendant with a single count of possession of a concealed weapon (§ 25400, subd. (c)(6)). Prior to the filing of the information, defendant filed a motion to suppress evidence arguing his detention was a violation of the Fourth Amendment to the United States Constitution and requesting the suppression of evidence derived from his warrantless detention, search, and seizure, including a concealed firearm found on his person. Defendant's suppression motion was heard concurrent with the preliminary hearing.

At that hearing, the People produced evidence that Stockton Police Sergeant Ryan Taiariol observed defendant while engaged in a gang investigation in the area. Sergeant Taiariol was in plain clothes and seated in a parked unmarked truck. He observed defendant and two companions walking side by side on the sidewalk. Defendant was wearing a black shirt and black pants that were a little large for him. Defendant held his right hand near his right hip in a manner consistent with carrying a concealed firearm and what Sergeant Taiariol would do when he carried a concealed firearm.

Sergeant Taiariol watched the trio approach, pass him, and walk away, noting defendant had a bulge under his shirt in the area of his right hip, but he could not describe

2

the size, color, or shape of the object causing it. As defendant walked away, Sergeant Taiariol saw him adjust himself as if he were pushing an object away from his body. Defendant rested his hand on the concealed object, and Taiariol believed defendant was adjusting a firearm, even though he conceded he could not see the object because it was beneath the shirt. He based this opinion on his 13 years of experience as a police officer (including SWAT and gang unit work), as well as his experience carrying a concealed weapon when off duty.

Feeling that it would be unsafe to approach defendant in plain clothes, Sergeant Taiariol requested other officers in the area help watch the group until a uniformed officer could contact defendant and his companions to confirm whether they were armed and to get their names. These officers, including Taiariol, communicated over the radio as to the group's whereabouts until uniformed officers were able to arrive. On cross-examination, Taiariol stated he had requested that the men be detained. Sergeant Taiariol watched defendant while waiting for patrol to arrive, briefly losing him and then locating him partially crouched behind some bushes that were approximately four feet tall and about four to five feet away from the street, which he found suspicious.[2]

Officer Manjit Singh was dispatched to make contact with defendant and his companions. He located three men matching the description that dispatch had provided and watched them for approximately 45 seconds. They were walking along the sidewalk and were not committing any apparent crime. Officer Singh was told one of the men might be armed, but did not observe a gun. Singh and his partner activated the lights on their cruiser, left the car, drew their service guns (pointing them at the three men), and

---

[2] While the officers were communicating on the radio, it is not clear whether Taiariol shared his observation that defendant and his companions were crouching in the bushes prior to their detention. The original call to dispatch preceded that observation and Taiariol testified he made his decision to detain the trio before he observed them crouching in the bushes.

ordered that they get onto their knees and put their hands in the air. The men complied and were subsequently handcuffed and searched, revealing that defendant was carrying a black, loaded nine-millimeter semiautomatic pistol.

Following the hearing, the trial court denied defendant's suppression motion, finding the testimony of Sergeant Taiariol, that he believed defendant had a gun, was credible as was Taiariol's testimony regarding his experience and observations of defendant adjusting an object in his waistband, resting a hand on that object, and later attempting to hide in the bushes. This provided reasonable suspicion that defendant was involved in criminal activity justifying the detention under the circumstances. Taiariol did not effectuate the stop himself because of officer safety concerns. Taiariol's reasonable suspicion was communicated to dispatch, who then advised Officer Singh who actually effectuated the detention.

Defendant renewed his motion to suppress on September 21, 2020, which was denied on October 5, 2020. The same day, defendant entered a negotiated plea agreement whereby he pleaded no contest in exchange for probation and an opportunity to reduce his conviction to a misdemeanor under specified circumstances.[3] Defendant was sentenced immediately to informal probation for five years under specified terms, including 120 days in county jail with credit for four days served. The court also imposed a $300 restitution fine (§ 1202.4, subd. (b)), a $300 stayed probation revocation restitution fine (§ 1202.44), a $30 criminal conviction assessment fee (Gov. Code, § 70373, subd. (a)(1)), a $40 court security fee (§ 1465.8), and any applicable surcharges (§§ 1202.4, subd. (l), 1464, 1465.7). Defendant timely appealed.

---

[3] This plea agreement also resolved a misdemeanor violation of Vehicle Code section 23103, which was charged in a separate action and was not included within defendant's notice of appeal in this action.

4

# DISCUSSION

## I

### *The Motion to Suppress*

Defendant argues the trial court erred in denying his motion to suppress evidence (§ 1538.5) recovered as a result of his unlawful detention and de facto arrest. The People concede defendant was detained without reasonable suspicion. For the reasons we shall explain, we reject this concession.

The Supreme Court of the United States held in *Terry v. Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889] that the legality of temporary detentions is determined under the general proscription of unreasonable searches and seizures contained in the Fourth Amendment of the federal Constitution. (*Terry,* at p. 20.) " ' "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." ' " (*People v. Suff* (2014) 58 Cal.4th 1013, 1053-1054 (*Suff*).) "[A] Fourth Amendment seizure occurs only when an officer intentionally applies hands-on, physical restraint to a suspect [citations] or initiates a show of authority to which a reasonable innocent person would feel compelled to submit [citation], and to which the suspect actually does submit [citation] for reasons that are solely related to the official show of authority." (*People v. Cartwright* (1999) 72 Cal.App.4th 1362, 1367, italics omitted.)

A warrantless search or seizure is presumed to be unreasonable, and when a defendant moves to suppress evidence obtained from such a search or seizure, " 'the prosecution bears the burden of demonstrating a legal justification for the search.' " (*Suff, supra*, 58 Cal.4th at p. 1053.) Courts look for an "objective justification" for the warrantless police action. (*Illinois v. Wardlow* (2000) 528 U.S. 119, 123 [145 L.Ed.2d 570, 576].) The actual motivation of the officers is not relevant. (*Suff*, at p. 1054.)

5

Generally speaking, evidence obtained as a result of an unlawful detention should be suppressed. (See, e.g., *People v. Valenzuela* (1994) 28 Cal.App.4th 817, 830.)

"[P]ossible innocent explanations for an officer's observations do not preclude the conclusion that it was reasonable for the officer to suspect that criminal activity was afoot. ' "Indeed, the principal function of [police] investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal . . . ." [Citation.]' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 148.) "The citizen's undoubted interest in freedom from abuse of this procedure is protected—so far as it is within the law's power to do so—by the correlative rule that no stop or detention is permissible when the circumstances are not reasonably 'consistent with criminal activity' and the investigation is therefore based on mere curiosity, rumor, or hunch." (*In re Tony C.* (1978) 21 Cal.3d 888, 894.) Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " (*United States v. Arvizu* (2002) 534 U.S. 266, 273 [151 L.Ed.2d 740, 749-750].)

On appeal, " ' "[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." ' " (*Suff, supra*, 58 Cal.4th at p. 1053.)

Here, the trial court denied defendant's suppression motion concurrent with the preliminary hearing determination. The court found Sergeant Taiariol's testimony credible that he thought defendant was armed with a gun and credited Taiariol's experience and observations of defendant adjusting an object in his waistband, resting a hand on that object, and later attempting to hide in the bushes. The court determined this provided reasonable suspicion that defendant was involved in criminal activity justifying the detention under the circumstances. Taiariol did not effectuate the stop himself because of officer safety concerns. Taiariol's reasonable suspicion that defendant was

armed was communicated to dispatch, who then advised Officer Singh who actually effectuated the detention.

In determining whether there was reasonable suspicion supporting defendant's detention, the similar facts and reasoning in *United States v. Bontemps* (2020) 977 F.3d 909 (*Bontemps*) is instructive. In *Bontemps*, the Ninth Circuit Court of Appeals determined whether an officer's observation of a bulge under a sweatshirt likely indicating a concealed firearm provided reasonable suspicion to justify an investigative detention (*id*. at pp. 911-912), ultimately holding "a bulge that appears to be a concealed firearm can form the basis for a *Terry* stop in a jurisdiction where carrying a concealed weapon is presumptively unlawful." (*Id*. at p. 915.)

That record reflected that officers patrolling in their black police SUV observed four young men walking in a mixed-use area. One of the men, later identified as Mills, had a bulge in a sweatshirt pocket consistent with carrying a handgun. The officers made a U-turn and slowed to observe the men more closely. When they did, they noted another man, Bontemps, had a partially zipped sweatshirt with a large and obvious bulge on his left side between his waist and armpit. Given this observation and the detective's training and prior encounters with individuals carrying firearms, the detective believed Bontemps was also carrying a concealed firearm. (*Bontemps, supra*, 977 F.3d at p. 912.)

Detectives did another U-turn, exited the SUV, and ordered the men to sit on the curb. The men complied, but Mills had his hands in his pocket, where he was suspected of concealing a firearm. Detective Barreto drew his pistol, holding it at his side and directed Mills to remove his hands from his pocket and keep them in the air. A search of the pocket revealed a nine-millimeter Glock with a live round in the chamber. (*Bontemps, supra*, 977 F.3d at pp. 912-913.) In the meantime, Bontemps became argumentative and started yelling at officers and passing cars, resulting in a call for backup and Bontemps being tased. Another officer drew his gun and ordered the men to lay on their stomachs. Detectives handcuffed and searched the men, revealing that

7

Bontemps had a concealed .40-caliber Glock 22 with the serial number ground off in a shoulder holster on his left side.  Bontemps was determined to have an outstanding warrant and was on felony probation for carrying a loaded firearm in public.  (*Id.* at p. 913.)

Following the grand jury indictment charging Bontemps with being a convicted felon in possession of a firearm, Bontemps moved to suppress the evidence that had been gathered during the stop, arguing officers lacked reasonable suspicion.  The district court denied Bontemps's motion, finding the stop was justified.  The stop was initiated when the men were ordered to sit on the curb and was justified because " 'detectives had an objectively reasonable, articulable suspicion at the stop's inception' based on the 'visible bulge above Bontemps's waist.' "  (*Bontemps, supra*, 977 F.3d at p. 913.)  "In reaching this conclusion, the district court cited Detective Tonn's police report, which stated that he observed ' "a bulge on [Bontemps's] left waist/side area," and "feared Bontemps was armed." '  The court also credited Detective Tonn's testimony that 'he could see the bulge in Bontemps's jacket from the car,' and that, 'based on his training and experience,' Tonn 'believed Bontemps was carrying a firearm.'  Finally, the court pointed to Detective Barreto's bodycam footage that confirmed 'there was a bulge on the left side of Bontemps's jacket, and that the bulge was visible from inside the patrol car.' "  (*Ibid.*)

In analyzing whether the officers had reasonable suspicion under these circumstances, the Ninth Circuit Court of Appeals began by noting that it had been long established that in California, evidence suggesting that a person was concealing a firearm would provide an adequate basis to initiate a *Terry* stop.  (*Bontemps, supra*, 977 F.3d at p. 914.)  Further, a tip that an individual was carrying a concealed firearm would provide reasonable suspicion for a stop even if the informant had not stated the person was carrying the firearm illegally or was about to commit a crime.  This is because in California, "it is generally illegal to carry a concealed firearm in public" and permits to

8

carry such weapons are not common, thus justifying a reasonable officer to conclude that an individual suspected of carrying a concealed firearm is doing so in contravention of the law. (*Ibid*.) This analysis would be different depending on the rules of the pertinent jurisdiction for the carrying of concealed weapons. (*Ibid*. [a tip that an individual was armed with a gun did not justify stop because "carrying a firearm is 'presumptively lawful in Washington' "], quoting *United States v. Brown* (2019) 925 F.3d 1150, 1153-1154.)

As to whether the officers had a reasonable suspicion that Bontemps was concealing a firearm, the court noted that prior authority had given great weight to officer observations of bulges possibly indicating a suspect could be armed. Bontemps argued that no authority established that reasonable suspicion could be based on the presence of a suggestive bulge alone and that relying solely on a bulge would be unreliable because it could be caused by something else. (*Bontemps, supra*, 977 F.3d at pp. 914-915.)

The court concluded "a bulge that appears to be a concealed firearm can form the basis for a *Terry* stop in a jurisdiction where carrying a concealed weapon is presumptively unlawful." (*Bontemps, supra*, 977 F.3d at p. 915.) This determination should be made in consideration of all the circumstances and is consistent with *Terry* and its progeny. That a bulge may give rise to reasonable suspicion of an illegal weapon is consistent with how such weapons are typically carried, as implicit in carrying a "concealed" weapon is that the weapon is covered with something. (*Bontemps,* at p. 915.) "A rule that always required more than a suggestive bulge, or that required the concealed weapon to be revealed, would run counter to *Terry*'s fact-based standard and pose obvious safety concerns." (*Ibid.,* citing *Pennsylvania v. Mimms* (1977) 434 U.S. 106, 112 [54 L.Ed.2d 331, 338] [upholding under *Terry* a patdown after a vehicle stop because "[t]he bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer"].)

9

We agree with the reasoning of *Bontemps* and conclude reasonable suspicion supported defendant's detention in this case. As recounted above, the testimony at the preliminary hearing established Sergeant Taiariol, who was dressed in plain clothes and sitting in an unmarked truck, observed defendant while engaged in a gang investigation in the area. Defendant and two companions were walking side by side on the sidewalk. Defendant was wearing clothing that was a little large on him and held his right hand near his right hip in a manner consistent with carrying a concealed firearm and what Sergeant Taiariol would do when he carried a concealed firearm.

Sergeant Taiariol watched the trio approach, pass him, and walk away, noting a bulge under defendant's shirt in his right hip area. As defendant walked away, Sergeant Taiariol saw him adjust himself as if he were pushing an object away from his body. Defendant rested his hand on the concealed object, and Taiariol believed defendant was adjusting a firearm, even though he could not see the object because it was beneath the shirt. His opinion was based on his 13 years as a police officer (including SWAT and gang unit work), as well as his experience carrying a concealed weapon when off duty. Believing it would be unsafe to approach defendant in plain clothes, Taiariol requested other officers in the area help watch the group until a uniformed officer could contact defendant and his companions to confirm whether they were armed and to get their names.

Reviewing the trial court's legal determination on the constitutionality of the stop in light of this evidence and the court's factual findings, we conclude reasonable suspicion supported the stop. (*Suff, supra*, 58 Cal.4th at p. 1053; *Bontemps, supra*, 977 F.3d at p. 915.) This case does not represent a stop based solely on the observation of a nondescript bulge under defendant's clothing. Sergeant Taiariol was an experienced officer and carried concealed firearms when off duty. He not only observed a bulge at defendant's waist, he also saw defendant adjusting that object and resting his hand upon it consistent with carrying a concealed firearm. That defendant was possibly armed and

10

dangerous was underscored by Sergeant Taiariol's decision not to contact defendant in plain clothes due to safety concerns, and defendant's suspicious behavior of crouching in the bushes. Considering all these circumstances, we conclude reasonable articulable suspicion supported the stop.

We also reject defendant's argument that his detention was so severe as to amount to a de facto arrest.

As recognized by our Supreme Court, "The distinction between a detention and an arrest 'may in some instances create difficult line-drawing problems.' (*United States v. Sharpe* (1985) 470 U.S. 675, 685 [84 L.Ed.2d 605,]; see also *United States v. Torres-Sanchez* (9th Cir. 1996) 83 F.3d 1123, 1127 [there is no ' "bright-line for determining when an investigatory stop crosses the line and becomes an arrest" '].)" (*People v. Celis* (2004) 33 Cal.4th 667, 674 (*Celis*).) " '[T]here is no hard and fast line to distinguish permissible investigative detentions from impermissible de facto arrests. Instead, the issue is decided on the facts of each case, with focus on whether the police diligently pursued a means of investigation reasonably designed to dispel or confirm their suspicions quickly, using the least intrusive means reasonably available under the circumstances.' " (*Id.* at pp. 674-675.) "Important to this assessment, however, are the 'duration, scope and purpose' of the stop." (*Id.* at p. 675.)

Here, dispatch sent Officer Singh to check whether defendant and his companions were carrying concealed weapons, thus imputing Sergeant Taiariol's reasonable suspicion to him. (See, e.g., *United States v. Hensley* (1985) 469 U.S. 221, 231-233 [83 L.Ed.2d 604] [a detaining officer may rely on a wanted flyer produced by an officer with reasonable suspicion].) Officer Sigh and his partner activated the lights on their cruiser, left the car, drew their service guns (pointing them at the three men), and ordered the men to get onto their knees and put their hands in the air. The men complied and were handcuffed and searched, revealing that defendant was carrying a black, loaded nine-millimeter semiautomatic pistol.

This encounter appears to have been brief, thus weighing against a finding of a de facto arrest. (*Celis, supra*, 33 Cal.4th at p. 675.) Further, defendant's detention at gunpoint on a public street was not unconstitutionally intrusive in light of the public safety hazard posed by the reasonable suspicion that at least one of the three men was armed with a concealed firearm. (See *People v. Turner* (2013) 219 Cal.App.4th 151, 162-163 [the officer's actions of ordering Turner at gunpoint to the ground and handcuffing him were justified in order to safely ascertain whether Turner was carrying a firearm on school grounds]; *Celis,* at p. 675 [court must ask whether authorities diligently pursued their investigation using the " 'least intrusive means reasonably available under the circumstances' "; where the individual is suspected of committing a felony, "stopping a suspect at gunpoint, handcuffing him, and making him sit on the ground for a short period" would not convert a lawful detention into a de facto arrest].) Finally, the purpose of the stop, determining whether defendant was armed with a concealed firearm, likewise supports that officers did not use more intrusive methods than were necessary in the light of the circumstances. (*Celis*, at pp. 675-676.) Based on the record, we conclude defendant was not subject to a de facto arrest.

## II

### *Retroactive Application of Assembly Bill 1950*

The parties agree that Assembly Bill 1950 should retroactively apply to defendant's nonfinal judgment. For the reasons stated by this court in *People v. Lord* (2021) 64 Cal.App.5th 241, 244-246, we conclude defendant is entitled to have his probation term reduced to the new maximum term of two years. (§ 1203.1, subd (a).)[4]

However, the People argue that remand is necessary and that they should be afforded the opportunity to withdraw from the plea agreement in light of this legislation

---

[4] We note that neither of the exceptions to the two-year limitation apply to this matter. (§ 1203.1, subd. (m).)

12

and *People v. Stamps* (2020) 9 Cal.5th 685. (RB 24-27) We are unpersuaded that the People are entitled to this relief for the reasons explained in *People v. Stewart* (2021) 62 Cal.App.5th 1065, 1074-1079 (*Stewart*).

Moreover, defendant was sentenced to probation on October 5, 2020, and his new two-year probation term will not expire prior to the completion of this appeal. Thus, we see no reason not to modify the judgment to reflect the required reduction in defendant's probation term. (*Stewart, supra*, 62 Cal.App.5th at p. 1079.) Should this change necessitate other modifications, the trial court retains jurisdiction over defendant until the completion of the probation term. (See *People v. Quinn* (2021) 59 Cal.App.5th 874, 885, fn. 6 [recognizing "[n]othing herein precludes defendant from moving the trial court to modify the conditions of her probation in light of the reduced term of probation"]; § 1203.3 [recognizing the court retains jurisdiction "during the term of probation to revoke, modify, or change" its previous order].)

## III

### *The Custody Credits*

Finally, we conclude defendant should have been awarded four days conduct credit, bringing his total presentence custody credits to eight days. Pursuant to section 4019, defendant was entitled to two days presentence conduct credit for every two days served. (*People v. Whitaker* (2015) 238 Cal.App.4th 1354, 1358, 1362.) At sentencing, the trial court awarded defendant four days actual credit, but neglected to award him the four days conduct credit. (*Ibid*.) We will modify the judgment to correct this error.

## DISPOSITION

We modify the judgment to limit defendant's term of probation to two years and award defendant four conduct custody credits plus the four actual custody days already awarded for a total of eight days presentence custody credits. The judgment is affirmed as modified. The trial court is directed to update its records to reflect these modifications

and forward those documents to any appropriate entities, including the probation department and county jail.

                                                              /s/
                                                              HOCH, J.

We concur:

/s/
MAURO, Acting P. J.

/s/
RENNER, J.